## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WILLIAM J. HORAN,** | : |
| **Plaintiff** | : |
| | : **CIVIL ACTION NO. 4:08-0529** |
| **v.** | : |
| | : **(MCCLURE, D.J.)** |
| | : **(MANNION, M.J.)** |
| **UNITED STATES OF AMERICA;** | |
| **DR. VERMEIRE; MS. DEWALD;** | : |
| **WILLIAMSPORT HOSPITAL;** | |
| **DR. WILLIAM W. BANKS;** | : |
| **DR. JOHN C. MALLOY AND** | |
| **JOHN DOES (1-5),** | : |
| **Defendants** | : |

## <u>REPORT AND RECOMMENDATION</u>

Pending before the court are the following motions: (1) a motion for summary judgment[1] filed on behalf of defendants Williamsport Hospital and Banks, ("Williamsport defendants"), (Doc. No. 32); (2) a motion to dismiss the plaintiff's complaint filed on behalf of defendant Malloy, (Doc. No. 35); and (3) a motion to dismiss and for summary judgment filed on behalf of defendants United States of America, Vermeire, and DeWald, ("Government defendants"), (Doc. No. 53).

---

[1]The court notes that this motion was originally filed as a motion to dismiss. However, it was subsequently converted to a motion for summary judgment, with the plaintiff having an opportunity to respond to the motion as such.

## I.   PROCEDURAL HISTORY

By way of relevant background, on March 24, 2008, the plaintiff, a former inmate at the United States Penitentiary at Allenwood, ("USP-Allenwood"), White Deer, Pennsylvania, filed the instant combined Federal Tort Claims Act, ("FTCA"), 28 U.S.C. §2671, et seq., and Bivens[2] action in which he alleges both negligence and deliberate indifference on the part of the defendants in relation to an assault upon him on August 20, 2006, and the subsequent medical treatment for his injuries. (Doc. No. 1).

On July 1, 2008, a motion to dismiss the plaintiff's complaint[3] was filed on behalf of defendants Williamsport Hospital and Banks, ("Williamsport defendants"). (Doc. No. 32). On August 1, 2008, the plaintiff filed a premature brief in opposition to the Williamsport defendants' motion. (Doc. No. 46). After having been granted extensions of time to do so, on October 6, 2008, the Williamsport defendants filed supporting exhibits, (Doc. No. 77), along with a statement of material facts, (Doc. No. 78). A brief in support of the Williamsport defendants' motion was filed on October 23, 2008.  (Doc. No. 86). On October 27, 2008, the plaintiff filed a "supplemental" brief in opposition to the Williamsport defendants' motion, (Doc. Nos. 87-88), along with supporting exhibits, (Doc. Nos. 89-90, 92).  A reply brief was filed by the

_____

[2]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

[3]See n.1.

2

Williamsport defendants on November 10, 2008.  (Doc. No. 96).

In the meantime, on July 8, 2008, a motion to dismiss the plaintiff's complaint was filed on behalf of defendant Malloy, (Doc. No. 35), along with a brief in support thereof, (Doc. No. 36). The plaintiff filed a brief in opposition to the motion on August 1, 2008. (Doc. No. 47). On August 11, 2008, the plaintiff filed what the court construes as a supplemental brief in opposition to defendant Malloy's motion to dismiss. (Doc. No. 51).

On August 13, 2008, the Government defendants filed a motion to dismiss and for summary judgment. (Doc. No. 53). On September 3, 2008, the Government defendants filed a brief in support of their motion, (Doc. No. 63), along with supporting exhibits, (Doc. No. 64), and a statement of material facts, (Doc. No. 65). The plaintiff filed a brief in opposition to the Government defendants' motion on October 10, 2008. (Doc. Nos. 79-85[4]). A reply brief was filed on behalf of the Government defendants on October 30, 2008. (Doc. No. 93).

## II.   LEGAL STANDARDS

The defendants' motions are brought, in part, pursuant to the provisions of Fed.R.Civ.P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can

---

[4]The plaintiff's brief in opposition was broken down into several parts each of which were docketed separately by the Clerk's Office.

granted. The moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007)(abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." Twombly, 127 S.Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. Id. Furthermore, in order satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)(brackets and quotations marks omitted)(quoting Twombly, 127 S.Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d

1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. See e.g., Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." Alston v. Parker, 363 F.3d 229, 236 (3d Cir. 2004).

The defendants' motions are also brought, in part, pursuant to the provisions of Fed.R.Civ.P. 56. Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party." Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted). Material facts are those which will effect the outcome of the trial under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court may not weigh the evidence nor make credibility determinations. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998). In determining whether an issue of material

fact exists, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  Id.

## III.    DISCUSSION

In his complaint, the plaintiff alleges, generally, that the defendant United States has "caused great personal injury to [him] through employees of the Federal Bureau of Prisons, ("BOP"), specifically United States Penitentiary Allenwood medical staff and agents acting on their behalf." According to the plaintiff, his injuries were the result of "blatant negligence and medical malpractice which caused severe pain and suffering, physically and emotionally to [him] for over twenty months."

The plaintiff further asserts that defendants Banks, Malloy, and the Williamsport Hospital were "negligent while acting as agents or contractors for the Bureau of Prisons," and defendants Vermeire and DeWald were negligent while acting within the scope of their employment.

The plaintiff alleges that his constitutional rights were violated when all defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

Specifically, the plaintiff sets forth the following allegations in his

complaint. He has been in the custody of the BOP since September 19, 2002. On August 20, 2006, there was an inter-racial assault in the prison yard at USP-Allenwood involving inmates from Unit 4-B. Following the assault, Unit 4-B was not secured and approximately 128 inmates in the Unit were left "milling about the dayroom." At this time, the plaintiff alleges that he was attempting to take a shower when an elderly inmate was attacked by several gang member inmates. The plaintiff alleges that he attempted to assist the elderly inmate and was himself "beat with locks, stabbed multiple times and kicked repeatedly." The plaintiff was later cleared of any wrong doing with respect to the incident. With respect to this incident, the plaintiff claims that the staff at USP-Allenwood were negligent in not assessing and taking action after the inter-racial assault by securing the institution and Unit 4-B until the implications to other inmates could be determined. The plaintiff claims that this directly led to the assault upon him.

The plaintiff's complaint goes on to allege that following the attack upon him, which occurred at approximately 3:20 p.m. on August 20, 2006, he was taken to the medical department where his knife wounds were swabbed out and his injuries were photographed. He was then moved to the Special Housing Unit, ("SHU"), where he was placed in an indoor recreational cage without bandages, water, ice, or any other means to tend to his wounds. According to the plaintiff, he was spitting up blood and "bleeding freely." After hours in these conditions, the plaintiff claims that he was moved to a three-

man cell where he was left to "bleed out." Over the next few hours, the plaintiff's two cell mates pushed the panic button to obtain medical assistance for the plaintiff. The plaintiff claims that it was not until several hours later that he was transported to the Williamsport Hospital, where he was noted to arrive at 10:30 p.m.

According to the plaintiff, initial reports from the Williamsport Hospital indicated "multiple stab wounds, head and neck trauma, commuted displaced fracture of the left zygomatic arch[5], displaced fracture of the lateral wall of the maxillary sinus, blow out fracture of the left orbital floor, displaced fracture of the left nasal bone, TJM (sic) on the right side, along with multiple puncture wounds, contusions and abrasions." Within a matter of hours, the plaintiff alleges that he was returned to a three-man cell at USP-Allenwood, with his wounds untreated. He alleges that he was placed on a liquid diet and informed that he would receive follow-up medical treatment.

Over the next twelve day period, the plaintiff alleges that he was served dry oatmeal and bouillon cubes, with water only being provided to him on four occasions over that period. The plaintiff claims that officials were notified, including defendants Vermeire and DeWald, but the problem was never corrected.

Moreover, after the initial four day period, the plaintiff alleges that his

---

[5] The formation, on each side of the cheeks, of the zygomatic process of each malar bone articulating with the zygomatic process of the temporal bone. Taber's Cyclopedic Medical Dictionary 2371 (20th ed. 2005).

pain medication was cancelled and he was made to wait an additional seven days to undergo surgery. During this time, the plaintiff claims that he had no pain relief, medical attention or food.

On September 1, 2006, the plaintiff underwent surgery performed by defendant Banks. The plaintiff alleges that the surgery was a failure in that he was still unable to open his mouth after the surgery. The plaintiff was returned to USP-Allenwood later that day.

On September 11, 2006, the plaintiff returned to see defendant Banks, who ordered more x-rays. The plaintiff alleges that he pleaded with defendant Banks to attend to his condition so that the bones in his face would not heal out of place, but that defendant Banks informed him that there was plenty of time to treat his condition. The plaintiff was returned to USP-Allenwood, where he claims to have informed the medical staff that there was something "drastically wrong."

According to the plaintiff, he did not receive any follow up treatment for months.  He claims that he sent dozens of requests, letters and administrative remedies, but that he was ignored by officers, nurses and staff. It was not until November 13, 2006, when the plaintiff claims that he was sent to see another specialist, defendant Malloy, who informed him that it was too late for treatment, in that the bones in his face had healed out of place, and that it would take an extensive high-risk surgery to try to fix the problem.  Dr. Malloy ordered new CT scans and physical therapy to try to relieve the pressure on

10

the plaintiff's jaw and face. In addition, a follow-up visit was directed to be scheduled.

Upon his return to USP-Allenwood, the plaintiff alleges that defendant Malloy's recommendation for physical therapy was ignored and no follow-up visit was scheduled. In fact, the plaintiff alleges that ten months passed before he was seen again by defendant Malloy. On August 6, 2007, the plaintiff had a follow-up visit with defendant Malloy, at which time they discussed surgery options. According to the plaintiff, defendant Malloy indicated that he was not qualified to do the surgery needed to fix the plaintiff. The plaintiff was returned to USP-Allenwood. He alleges after submitting "hundreds" of sick call slips, letters, administrative remedies, and verbal requests with the "entire medical staff at USP-Allenwood," as well as remedies with "the warden, the region and Washington," he was told that USP-Allenwood would not authorize the surgery.

On November 19, 2007, the plaintiff alleges that he was sent to Geisinger Hospital to see "Dr. Lessin," who informed him that his only option was a procedure to cut away a piece of his jaw bone, instead of correcting the cheekbone and fracture itself. According to the plaintiff, the meeting with Dr. Lessin "ended poorly," and he was returned to USP-Allenwood.

According to the plaintiff's complaint, the disregard for his medical injuries resulting from the assault upon him on August 20, 2006, has compounded his other medical problems, including HIV and Hepatitis C.

11

Based upon the above allegations, the plaintiff has filed the instant five count complaint.  Counts I through IV are labeled as being brought pursuant to the FTCA. In Count I, the plaintiff alleges negligence based upon BOP employees' failure to provide him adequate medical care for the injuries he received in the assault. Count II alleges intentional infliction of emotional distress. Count III alleges negligent infliction of emotional distress. Count IV sets forth a failure to protect claim, in that BOP officials failed to secure the institution after the inter-racial incident which he claims directly led to the assault upon him. Finally, in Count V of the complaint, the plaintiff sets forth a <u>Bivens</u> claim against the individual defendants for exhibiting deliberate indifference to his serious medical needs.

According to the plaintiff's complaint, he has exhausted both his FTCA and institutional administrative remedies. He is seeking compensatory damages in the amount of $500,000 on the FTCA claim and $1 million on the <u>Bivens</u> claim.

### A. Motion for Summary Judgment Filed on Behalf of the Williamsport Defendants

The plaintiff has set forth only one count in his complaint applicable to the individual defendants, Count V, the <u>Bivens</u> deliberate indifference claim. All other counts are listed as FTCA claims, for which only the United States of America is the proper defendant. 28 U.S.C. §2674. However, construing the plaintiff's complaint liberally, as the defendants have done and as the

12

court must do, Haines v. Kerner, 404 U.S. 519, 520 (1972), the court interprets the plaintiff's complaint as setting forth the following claims against the Williamsport defendants: medical malpractice, intentional and negligent infliction of emotional distress, and deliberate indifference to the plaintiff's medical needs.

In conjunction with the Williamsport defendants' motion for summary judgment, they have submitted a statement of material facts supported by materials in the record, the following of which is undisputed[6]:

The plaintiff asserts that he was assaulted by fellow inmates on August 20, 2006. As the result of the assault, the plaintiff contends that he sustained injuries to the left side of his face, jaw and eye socket, as well as multiple stab wounds and lacerations.

Later that day, the plaintiff was transferred to the Williamsport Hospital and was admitted to its emergency room at approximately 9:10 p.m[7]. (Doc. No. 77, Ex. A, Emergency/Clinic Record dated August 20, 2006). Upon his arrival, the plaintiff was assessed by the triage nurse at the emergency room

---

[6]The facts are extracted from the Williamsport defendants' statement of material facts. Where the plaintiff does not dispute the Williamsport defendants' statement of facts, no reference to the record is provided. However, where the plaintiff does dispute the facts, record references are provided which support the facts relied upon herein.

[7]The plaintiff indicates that this fact is "possibly true," although he indicates that it "seemed later" when he arrived at the hospital. (Doc. No. 89, ¶5).

and thereafter examined by the emergency room physician. (Doc. No. 77, Ex. A, pp. 2-6). Hospital records reflect that the plaintiff complained primarily of moderate facial pain, but was noted to be in no acute distress[8]. (Doc. No. 77, Ex. A, p. 3). The plaintiff's vital signs were stable, and no respiratory, cardiovascular, gastrointestinal, or neurological abnormalities were noted[9]. (Id.). The plaintiff was noted to have superficial puncture wounds to his neck and back[10]. (Doc. No. 77, Ex. A, p. 4).

In the course of his treatment, the plaintiff was prescribed dilaudid, which is a pain medication, and phenergran for nausea at 9:45 p.m. He was prescribed dilaudid again at 11:15 p.m., as well as levaquin, which is an antibiotic. (Doc. No. 77, Ex. A, p. 7). Moreover, the emergency room physician ordered chest x-rays and CT studies of the plaintiff's head, face and neck. (Doc. No. 77, Ex. A, p. 2).

The following findings and impressions were noted with respect to the CT scan of the plaintiff's face:

---

[8]The plaintiff disputes this fact. (Doc. No. 89, ¶7). However, in support of his version of this fact, the plaintiff cites to his medication record for the day in question, (Doc. No. 92, Ex. 3), which provides no information whatsoever with respect to the plaintiff's examination or physical findings made by the Williamsport Hospital's emergency room physician.

[9]See n.7.

[10]In disputing this fact, the plaintiff cites to medical records relating to treatment of his facial injuries, which do not reflect the severity of the puncture wounds he sustained. (Doc. No. 92, Ex. 1, 2, 4).

> There is a comminuted displaced fracture of the left
> zygomatic arch.
> There is a comminuted displaced fracture of the
> lateral wall of the left maxillary sinus.
> There is a blowout fracture of the left orbital floor with
> minimal left maxillary hernosinus.
> There is a minimally displaced fracture of the left
> nasal bone with adjacent soft tissue swelling.
> There is soft tissue swelling with air loculi in the left
> facial, temporal and inframtemp oral regions.

(Doc. No. 77, Ex. A, p. 12; Doc. No. 92, Exs. 1-2). The x-rays of the plaintiff's

chest and CT scan of his head showed no abnormalities[11]. (Doc. No. 77, Ex.

A, pp. 10-11). The plaintiff was discharged from the emergency room at

approximately 11:25 p.m. on August 20, 2006, in no distress. Instructions

were provided to contact defendant Banks to schedule a follow-up visit[12].

(Doc. No. 77, Ex. A, pp. 6, 8).

The affidavit of defendant Banks provides that the fractures which the

plaintiff sustained were non-emergent in nature and did not require immediate

surgery or admission to the hospital. (Doc. No. 77, Ex. B, ¶11). Moreover,

defendant Banks has opined that it is safer, and therefore preferable, to avoid

placing a patient under sedation and performing immediate surgery when a

patient, such as the plaintiff, has sustained facial and head injuries because

---

[11]In disputing this fact, the plaintiff relies upon medical records which
pertain only to the CT scan of his face. (Doc. No. 89, ¶12; Doc. No. 92, Exs.
1-2).

[12]In disputing this fact, the plaintiff relies upon medical records which are
unrelated to his discharge from the Williamsport Hospital emergency room.
(Doc. No. 89, ¶13; Doc. No. 92, Exs. 1-4).

of potential complications which may arise.  (Id.). He has further opined that it is not preferable to perform immediate surgery of the nature required by the plaintiff due to facial swelling which inhibits physical assessment of the injuries by the surgeon as they must be performed by manual manipulation. (Id.). Finally, defendant Banks provides that there were no adverse consequences by not immediately performing surgery on the plaintiff on August 20, 2006[13]. (Id.).

On August 22, 2006, the plaintiff was seen by defendant Banks.  (Doc. No. 77, Ex. B, ¶13; Ex. C, pp. 7-8). At that time, defendant Banks' records reflect that the plaintiff complained of his left eye being achy, but without visual problems. He also complained of numbness around his left cheek, having trouble moving his jaw to the side[14], having blood in his nose, and aches in his left upper teeth. (Doc. No. 77, Ex. C, p. 7). Upon examination, defendant Banks noted that the plaintiff's left face was flattened, he had redness on his left lateral sclera, his eye movement was normal, and he had

---

[13]The plaintiff generally denies the statements provided by defendant Banks in this paragraph. However, he cites to no support to the contrary. (Doc. No. 89, ¶¶14-17).

[14]The plaintiff disputes this fact only to the extent that he claims that he could not open his mouth at all. (Doc. No. 89, ¶21). However, other than his own allegations, the plaintiff provides no support for this contention. The medical records speak for themselves.

moderate pain opening his jaw[15]. (Id.). Defendant Banks diagnosed the plaintiff with a fractured left zygomatic arch, left blow out fracture of the floor of the orbit and maxillary orbit fracture. (Id. at p. 8). Defendant Banks scheduled surgery for September 1, 2006, for the open reduction of the fracture of the plaintiff's left zygomatic arch and left blow out fracture. (Id.).

On Friday, September 1, 2006, the plaintiff underwent surgery by defendant Banks. (Doc. No. 77, Ex. D). The plaintiff was discharged from the Williamsport Hospital on the same day, with records indicating that he was in good condition with no restrictions on his diet and activity[16]. (Doc. No. 77, Ex. D, p. 3). The plaintiff was given instructions to avoid any pressure being placed on his left cheek, to not soak his suture in water, and to remove his left eye dressing and the drain from his left temple on September 2, 2006. The plaintiff was prescribed Lortab tablets to be taken every four hours as needed for pain for one week and to see defendant Banks in one week for follow-up[17].

On Monday, September 11, 2006, the plaintiff was seen by defendant

---

[15]The plaintiff disputes this fact to the extent that he again claims he could not open his mouth at all and further disputes the level of his pain in attempting to do so. (Doc. No. 89, ¶22). In support of this, the plaintiff cites to Dr. Banks' medical records dated September 11, 2006, which are unrelated to the examination of August 22, 2006. (Doc. No. 92, Ex. 4). As previously noted, the medical records speak for themselves.

[16]See n.14.

[17]The plaintiff does not dispute this fact, but indicates that he was not actually given the entire prescription and that he was not scheduled for a follow-up until ten or eleven days later. (Doc. No. 89, ¶28).

Banks for follow-up, at which time he complained of numbness over his left cheek and upper lip, but indicated that the numbness was less intense since the sutures under his eye were removed. (Doc. No. 77, Ex. C, pp. 1, 3). The plaintiff complained that his left temporal mandibular joint, ("TMJ"), made a grinding sound, that he was unable to move his jaw laterally, that his jaw locked, and that he was unable to eat hard foods. In addition, the plaintiff complained of some depression in his left cheek. Upon examination, defendant Banks noted that the plaintiff's eye suture was well healed and that his left cheek had some displacement. Defendant Banks ordered repeat x-rays to be taken of the plaintiff's zygomatic arch, as well as x-rays of the plaintiff's TMJ.

X-rays were taken of the plaintiff on September 14, 2006, at USP-Allenwood[18], and were sent for interpretation by Kenneth Levine, M.D., of Omnimed Medical Services in Huntingdon Beach, California, on September 26, 2006. (Doc. No. 77, Ex. C, p. 15). Dr. Levine's impression of the TMJ films were "[a]bsent left and probably impaired right condular motion with opening of the mouth . . .[19]" (Id.) Dr. Levine's interpretation of the zygomatic arch

_____

[18]The plaintiff neither admits nor denies this statement, but simply indicates that "[he] was not there." He provides no support for his claim. Moreover, the medical records speak for themselves.

[19]The plaintiff does not dispute this statement, but indicates that he did not have a history of TMJ before the surgery performed by defendant Banks. (Doc. No. 89, ¶ 39).

showed an age indeterminate fracture. (Doc. No. 64, Ex. A, Attachment 1, p. 37).

On October 17, 2006, defendant Banks received a telephone message from Lisa Rae from USP-Allenwood inquiring as to what was the next step with regard to the plaintiff's treatment. (Doc. No. 77, Ex. C, p. 14). On or about that date, defendant Banks informed officials at USP-Allenwood that the plaintiff would need to see an oral surgeon for his TMJ problem. (Doc. No. 77, Ex. C, p. 14; Doc. No. 92, Ex. 6). Defendant Banks has provided that he is a board certified otolaryngologist, but is not qualified to perform surgery to repair a TMJ, and that such surgery would have to be performed by an oral surgeon. (Doc. No. 77, Ex. B, ¶26).

In defendant Banks' opinion, the plaintiff's TMJ problem was not an emergent situation and did not require immediate treatment. (Id. at ¶27). It is also defendant Banks' opinion that the repair of the plaintiff's zygomatic arch was a non-emergent situation and is considered elective cosmetic surgery which would have to be performed by either an oral surgeon and/or plastic surgeon. (Id. at ¶29). In defendant Banks' opinion, because the plaintiff's facial bones would have healed by September 26, 2006, when the interpretation of the x-rays of his face took place, to achieve the cosmetic effect desired by the plaintiff would require that his zygomatic fracture be re-broken and screws used to re-fuse the fracture. (Id.). Defendant Banks provides that this is not within his expertise as an otolaryngologist, but would

19

be required to be performed by a plastic or oral surgeon. (Id.).

Defendant Banks considered his treatment of the plaintiff to have ended on or about October 17, 2006, when the plaintiff was referred to an oral surgeon, because defendant Banks could do no more for him at the time. (Doc. No. 77, Ex. B, ¶¶28-29).

On these facts, the court now turns to the claims raised by the plaintiff in his complaint against the Williamsport defendants. Initially, concerning the plaintiff's medical malpractice claim against the Williamsport defendants, Pennsylvania Rule of Civil Procedure 1042.3[20] requires that in an action

_____

[20]Rule 1042.3 of the Pennsylvania Rules of Civil Procedure provides, in relevant part:

(a) In any action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either

(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or

(continued...)

20

"based upon an allegation that a licensed professional deviated from an acceptable professional standard" the plaintiff is required to file a certificate of merit. This rule applies to pro se and represented plaintiffs alike and constitutes a rule of substantive state law with which plaintiffs in federal court must comply. See Perez v. Griffin, 2008 WL 2383072, *3 (M.D.Pa., 2008)(Conner, J.)(citing Iwanejko v. Cohen & Grigsby, P.C., 249 F. App'x 938, 944 (3d Cir. 2007) (holding that district courts must "appl[y] Rule 1042.3 as substantive state law"); Maruca v. Hynick, No. 3:06-CV-00689, 2007 WL 675038 (M.D.Pa. Feb. 27, 2007)("[T]he language of Rule 1042.3(a) – i.e., "or the plaintiff if not represented . . . shall file . . . a certificate of merit" – expressly requires that a pro se plaintiff must file a certificate of merit.")).

Upon review of the record, the plaintiff has filed what he has termed a certificate of merit, in which he states that he was unable to obtain a licensed professional to supply a written statement corroborating the claims which he has raised. (Doc. No. 1, Attachment). As such, he requests that the court use the medical reports prepared at the Williamsport Hospital and by defendants Malloy and Banks in support of his claim. However, the plaintiff's "certificate of merit" does not meet the requirements of Pa.R.Civ.P. 1042.3, as set forth

---

[20](...continued)

(3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim.

Pa.R.C.P. 1042.3.

herein.   As the time for filing an appropriate certificate of merit has long passed, the Williamsport defendants are entitled to summary judgment with respect to the plaintiff's medical malpractice claim against them.

With respect to the plaintiff's claim that the Williamsport defendants were deliberately indifferent to his serious medical needs, in order to establish an Eighth Amendment claim based upon allegations of denial of proper medical care, an inmate must demonstrate a deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97 (1976). This standard requires both deliberate indifference on the part of the prison officials and a serious medical need on the part of the prisoner. See West v. Keve, 571 F.2d 158 (3d Cir. 1978).

A deliberate action is one which is intentional, requiring the actor to have knowledge of the events attributed to the injury and the ability to control the outcome. "To establish a constitutional violation, the indifference must be deliberate and the actions intentional." Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976). A mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives, does not support an Eighth Amendment claim. Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir. 1976).

A medical need is "serious" where it has been diagnosed by a physician

22

as mandating treatment, or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)(citing Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987)), cert. denied, 500 U.S. 956 (1991).

The Supreme Court has held that negligence or inadvertence alone do not rise to the level of a constitutional deprivation. Whitley v. Albers, 475 U.S. 312 (1986); Davidson v. Cannon, 474 U.S. 344 (1986). In Daniels v. Williams, 474 U.S. 327, 332 (1986), the Court noted that "[l]ack of due care suggests no more than a failure to measure up to the conduct of a reasonable person." Where a state of mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations. See generally  Wilson v. Seiter, 501 U.S. 294 (1991).

Further, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, the federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law. See  Ellison v. Scheipe, 570 F. Supp. 1361, 1363 (E.D. Pa. 1983); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754,762 (3d Cir. 1979); See also Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976). The key question is whether the defendants have provided the plaintiff with some type of treatment, regardless of whether it is what the

23

plaintiff desired. Farmer v. Carlson, supra, 685 F. Supp. at 1339.

Here, the record demonstrates that the plaintiff received treatment from both the Williamsport Hospital and defendant Banks. To this extent, he was admitted to the Williamsport Hospital emergency room at approximately 9:10 p.m. on August 20, 2006. Upon arrival, he was assessed by a triage nurse and there after examined by a physician. He was prescribed medication and diagnostic studies were conducted. With nothing more to be done immediately, the plaintiff was discharged from the Williamsport Hospital at approximately 11:25 p.m, with instructions to follow-up with defendant Banks.

Two days later, on August 22, 2006, the plaintiff was seen by defendant Banks, who diagnosed the plaintiff with a fractured left zygomatic arch, left blow out fracture of the floor of the orbit and maxillary orbit fracture. The plaintiff was scheduled for surgery on September 1, 2006, to consist of open reduction of the fracture of the plaintiff's left zygomatic arch and left blow out fracture. The plaintiff underwent the procedure with defendant Banks on September 1, 2006, after which he was discharged in good condition. Instructions and prescription medications were sent with the plaintiff. The plaintiff was seen for follow-up with defendant Banks on September 11, 2006, at which time defendant Banks noted that the plaintiff's eye suture was well healed and that his left cheek had some displacement. As a result, defendant Banks ordered repeat x-rays. The x-rays were taken at USP-Allenwood on September 14, 2006, and sent for interpretation to Omnimed Services on

September 26, 2006. Sometime thereafter, the report was forwarded to defendant Banks, who informed officials, on or about October 17, 2006, that the plaintiff would need to see an oral surgeon for repair of his TMJ. At this point, defendant Banks had considered his treatment of the plaintiff to have terminated as there was nothing more he could do for him.

Based upon the above facts, it cannot be said that the Williamsport defendants were deliberately indifferent to the plaintiff's serious medical needs. The plaintiff was provided  treatment. It appears, however, that the plaintiff is challenging the form of treatment he received. Such is not the proper subject for an Eighth Amendment inadequate medical care claim. As such, the Williamsport defendants' motion for summary judgment should be granted with respect to the plaintiff's deliberate indifference claim.

Concerning the plaintiff's claim of intentional infliction of emotional distress, Pennsylvania courts typically refer to Restatement (Second) of Torts §46 as establishing the "minimum requirements" for a claim of intentional infliction of emotional distress. See e.g. Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000)(citing Kazatsky v. King David Mem'l. Park, Inc., 527 A.2d 988 (Pa. 1987); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3rd. Cir.1979)). Thus, an action for intentional infliction of emotional distress requires that: (1) the conduct be extreme; (2) the conduct be intentional and reckless; (3) the conduct cause emotional distress; and (4) the distress be severe. Chuy, 595 F.2d at 1273. The degree of

outrageousness required is at least comparable to that required to support an award of punitive damages. Wisiniewski v. Johns-Manville Corp., 812 F.2d 81, 86 n.3 (3rd. Cir.1987). "It is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery." Strickland v. University of Scranton, 700 A.2d 979, 987 (Pa.Super. 1997)(citing Reimer v. Tien, 514 A.2d 566, 569 (Pa.Super. 1986)). Pennsylvania courts have defined the level of conduct required to be considered "outrageous":

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

Id. (citing Small v. Juniata College, 682 A.2d 350, 355 (Pa.Super. 1987)(quoting Jones v. Nissenbaum, Rudolph and Seidner, 368 A.2d 770, 773 (1976 )). See also McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 660-61 (Pa. Super. 2000).

In this case, it cannot reasonably be said that the actions of the Williamsport defendants in treating the plaintiff rose to the level of "extreme and outrageous" conduct necessary to set forth a state law claim for intentional infliction of emotional distress. Therefore, the defendants' motion for summary judgment should be granted with respect to the plaintiff's claim

for intentional infliction of emotional distress.

Finally, concerning the plaintiff's claim for negligent infliction of emotional distress, the Williamsport defendants argue that this claim is available only for bystanders. Historically, this was the case, but Pennsylvania courts have since held that a cause of action for negligent infliction of emotional distress may be sustained when "a plaintiff sustains bodily injuries, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff." Long v. Yingling, 700 A.2d 508, 516 (Pa. Super Ct.1997), appeal denied, Long v. Yingling, 555 Pa. 731, 725 A.2d 182 (Pa.1998); see also Giannone v. Ayne Inst., 290 F.Supp.2d 553, 569 (E.D.Pa.2003). However, on a claim for negligent infliction of emotional distress, Pennsylvania law requires that a plaintiff prove physical injury resulting from the emotional distress. McDuffie v. City of Philadelphia, 1996 WL 515906, *4 (E.D.Pa. 1996)(citing Wall by Lalli v. Fisher, 565 A.2d 498 (Pa. Super. 1989), app. denied, 584 A.2d 319 (Pa. 1989)).

Here, the plaintiff alleges that he "feels that [the] general disregard for his well being has compounded his other medical conditions," including HIV and Hepatitis C. (Doc. No. 1, ¶39)(Emphasis added). However, the plaintiff's "feeling" with respect to any adverse effect the emotional distress has had upon him is insufficient to support his claim. Therefore, the plaintiff's claim for negligent infliction of emotional distress should be dismissed.

27

## B.    Motion to Dismiss Filed on Behalf of Defendant Malloy

In his motion to dismiss the plaintiff's complaint, defendant Malloy

argues that he is only mentioned in three paragraphs of the plaintiff's

complaint, paragraphs 29, 30 and 32, which read as follows:

> 29.    On 11-13-06 Mr. Horan is finally sent to another
> specialist, Dr. John Malloy, <u>who immediately
> apologizes and says it's too late, the bones in
> his face have healed out of place</u>. That it would
> take an extensive, high risk surgery to fix Dr.
> Banks' failed surgery. (Emphasis in original).
> 30.    Dr. Malloy orders new cat (sic) scans, physical
> therapy to relieve pressure on Mr. Horan's jaw
> and face. Also a follow up visit.
> 32.    It would not be until August 6, 2007, that Mr.
> Horan is returned to see Dr. Malloy where they
> discussed surgery options, Dr. Malloy admits
> that he is not qualified to do the surgery needed
> to fix Dr. Banks' failed work. Mr. Horan is
> returned to ALP.

(Doc. No. 1)[21].

In light of the limited allegations against him, defendant Malloy argues

that the plaintiff's complaint should be dismissed as it fails to state a claim for

relief for medical malpractice against him. In the alternative, he argues that

the plaintiff's complaint should be dismissed for the plaintiff's failure to submit

---

[21]In his brief in opposition to defendant Malloy's motion to dismiss, the
plaintiff claims that additional allegations have been set forth against
defendant Malloy in his FTCA administrative claim, which has been
incorporated into the plaintiff's instant complaint by reference. Upon review,
although defendant Malloy is referenced several times in the plaintiff's
administrative tort claim, no additional substantive claims are made with
respect to him, only general claims of negligence or inadequate medical care.

a proper certificate of merit as is required by Pa.R.Civ.P. 1042.3.  (Doc. No. 36).

For the reasons set forth above, the court agrees that the plaintiff's complaint should be dismissed with respect to defendant Malloy for the plaintiff's failure to file an appropriate certificate of merit pursuant to Pa.R.Civ.P. 1042.3. Therefore, defendant Malloy's motion to dismiss should be granted on this basis.

Moreover, as noted above, although defendant Malloy only reads the plaintiff's complaint as setting forth a medical malpractice claim against him, the court has given the complaint a more liberal reading. To this extent, the plaintiff's complaint is also construed to allege claims for deliberate indifference and intentional and negligent infliction of emotional distress against defendant Malloy.

On the deliberate indifference claim, even accepting the allegations of the plaintiff's complaint as true, there is nothing to indicate that defendant Malloy was deliberately indifferent to the plaintiff's serious medical needs. The plaintiff's complaint provides that defendant Malloy saw the plaintiff on November 13, 2006, for a consultation. He examined the plaintiff and ordered CT scans and physical therapy to relieve pressure on the plaintiff's jaw and face.  At a follow-up visit, defendant Malloy discussed with the plaintiff other medical options, which included a high risk surgery, and informed the plaintiff that he was not qualified to perform such surgery. At this point, defendant

Malloy's treatment of the plaintiff ended. The plaintiff did receive some treatment from defendant Malloy, however, whether defendant Malloy provided the plaintiff with the specific treatment he sought is not a matter that violates the Eighth Amendment. Therefore, any claim for deliberate indifference against defendant Malloy should be dismissed.

The plaintiff's claim for intentional infliction of emotional distress should also be dismissed with respect to defendant Malloy. Upon review, the plaintiff has clearly not set forth the type of outrageous conduct with respect to defendant Malloy which is necessary to state a claim for intentional infliction of emotional distress under Pennsylvania law as set forth above.

Finally, for the reasons set forth above in addressing the Williamsport defendants' motion for summary judgment, the plaintiff's claim of negligent infliction of emotional distress should be dismissed with respect to defendant Malloy as well.

### C.    Motion to Dismiss and for Summary Judgment by the Government Defendants

In support of their motion for summary judgment, the Government defendants have filed a statement of material facts[22]. The following facts are

---

[22]With regard to the Government defendants' statement of material facts, the court notes that, while references are made to the paragraphs within the declarations of defendants Vermeire and DeWald in support of the factual statements, no references are made either in the statement of facts or in the (continued...)

undisputed and are supported by the record[23]:

The Government defendants are the United States of America on the FTCA claim and defendants Vermeire and DeWald on the Bivens claims. Defendant Vermeire was employed as a medical officer at USP-Allenwood from January 2005 through July 6, 2007.  In this position, defendant Vermeire was responsible for the evaluation and treatment of medical care with USP-Allenwood and for the supervision of mid-level providers.  Defendant Vermeire has reviewed the plaintiff's BOP medical records which revealed the following:

The plaintiff was assaulted by other inmates on August 20, 2006, at approximately 3:20 p.m. in a housing unit at USP-Allenwood. The plaintiff was treated by a paramedic at approximately 3:45 p.m. The plaintiff's injuries were found to be non-life threatening with a possible jaw fracture[24]. (Doc. No. 64,

---

[22](...continued)
declarations to the medical or institutional records which support those facts. This has resulted in the court having to page through the voluminous record to assure that the Government defendants' statements made are, in fact, supported by the records provided. Hopefully, government counsel will not repeat this omission in future cases.

[23]On several occasions, the plaintiff neither admits nor denies the Government defendants' statements of facts, but simply provides his own version of what occurred, sometimes with record references and other times without.  In these instances, the court provides the version of the facts which is supported by the record, with record references.

[24]The plaintiff denies this statement indicating that his eye socket was shattered, his mouth was "unoperable" and he was seriously wounded. (Doc. No. 85, ¶14).  However, he does not provide any support that his injuries were
(continued...)

Ex. A, ¶5). The plaintiff's wounds were cleansed, he was given pain medication and he was scheduled for dental x-rays for the following morning. (Id.).

Later that evening, at approximately 8:45 p.m., the plaintiff was transported to the Williamsport Hospital where he was examined in the emergency room. (Id. at ¶6). Upon examination, the plaintiff was noted to have superficial puncture wounds of his neck and back, a left orbital fracture, a left zygomatic fracture, and a maxillary sinus fracture. (Id.). The plaintiff's vital signs were stable and his neurological examination was unremarkable. (Id.). No respiratory or abdominal abnormalities were noted. (Id.). The plaintiff was subsequently discharged and returned to USP-Allenwood. (Id.).

Two days later, on August 22, 2006, the plaintiff was evaluated by an outside ENT surgeon, defendant Banks, at which time he was scheduled for surgery to correct his facial fractures. The plaintiff was then returned to USP-Allenwood.

Upon his return to USP-Allenwood, the plaintiff reported a pain level of seven on a scale of one to ten. As a result, he was prescribed Tylenol with codeine for five days[25]. (Doc. No. 64, Ex. A, ¶7, Attachment 1, p. 29).

---

[24](...continued)
not life threatening as the record reflects.

[25]The plaintiff does not deny this statement and, in fact, cites to the record which supports the statement, but indicates that he did not receive
(continued...)

On September 1, 2006, the plaintiff was escorted to the Williamsport Hospital where he underwent surgery. Upon his return to USP-Allenwood, the plaintiff reported a pain level of two on a scale of one to five. The plaintiff was prescribed five days of Tylenol with codeine[26] and was scheduled for a follow-up visit with defendant Banks for suture removal. (Doc. No. 64, Ex. A, ¶8, Attachment 1, pp. 27-28).

On the following day, September 2, 2006, the plaintiff was seen by medical staff at USP-Allenwood. The drain for his incision was removed and he received fresh bandages.

On September 11, 2006, the plaintiff was seen by defendant Banks for a post surgery follow up. At this time, his sutures were removed, and TMJ and zygomatic arch x-rays were ordered. Follow-up with defendant Banks was indeterminate pending the x-rays. Upon returning to USP-Allenwood from this visit, the plaintiff reported pain of three on a scale of one to five. (Doc. No. 64, Ex. A, ¶10).

On September 14, 2006, the follow up x-rays were completed.

On September 15, 2006, the plaintiff was seen during sick call, at which

_____

[25](...continued)
codeine for the entire period prior to surgery. (Doc. No. 85, ¶23).

[26]The plaintiff does not deny this statement, but indicates that he did not actually receive the full prescription of medication. (Doc. No. 85, ¶ 26). However, the record he cites to in support of his contention relates to his medical treatment on August 22, 2006, not September 1, 2006. (See Doc. No. 85, Ex. 8).

time he requested a refill of his pain medication and was prescribed Motrin.

On September 25, 2006, the plaintiff was seen during sick call and complained of facial pain. The plaintiff was examined by a physician's assistant and was prescribed additional Motrin.

On the following day, September 26, 2006, an outside radiologist reviewed the September 14, 2006, follow up x-rays, which revealed decreased motion in the left TMJ and an age indeterminate fracture of the left zygomatic arch.

On October 17, 2006, the plaintiff was examined by a physician's assistant[27]. The plaintiff complained of pain of an eight on a scale of one to ten. The physician's assistant noted that the plaintiff's bruising had subsided and that the plaintiff was alert and in no apparent distress. The plaintiff was prescribed Motrin for pain. It was noted that the results of the x-rays had not been received from defendant Banks and the physician's assistant made a note to call him.

On or about October 17, 2006[28], defendant Banks determined that there was nothing further he could do for the plaintiff and recommended that the plaintiff be evaluated by an oral surgeon.

On October 24, 2006, the plaintiff was examined by defendant Vermeire

---

[27]The plaintiff indicates that he was in solitary confinement at the time, but does not deny this statement. (Doc. No. 85, ¶41).

[28]As set forth in the facts relating to the Williamsport defendants' motion for summary judgment.

34

in the Special Housing Unit, ("SHU"). The plaintiff complained that he was unable to open his jaw and that it was "cracking." The plaintiff indicated that his pain was mostly relieved by Motrin. (Doc. No. 64, Ex. A, ¶16, Attachment 1, p. 21). Defendant Vermeire noted that the plaintiff's cheek was flattened in appearance and that there was crunching of his jaw with movement. He further noted that the plaintiff was able to open his jaw two centimeters and that there was bilateral movement of his jaw. Defendant Vermeire continued Motrin for pain and ordered an outside oral surgeon consultation after having a teleconference with the oral surgeon. (Doc. No. 64, Ex. A, ¶16).

On November 8, 2006, defendant Vermeire saw the plaintiff for an interim evaluation. The plaintiff indicated that his jaw was "some better." Defendant Vermeire noted that the plaintiff's jaw still opened two centimeters and that the oral surgeon consultation was still pending. Motrin was continued.

On November 13, 2006, the plaintiff was evaluated by the outside oral surgeon, defendant Malloy, who recommended both open and closed jaw CT scans. Defendant Malloy further recommended physical therapy to increase the plaintiff's range of motion[29]. The plaintiff was then returned to USP-Allenwood.

On December 20, 2006, defendant Vermeire spoke with defendant

---

[29]The plaintiff admits this fact, but indicates that he never actually received physical therapy.  (Doc. No. 85, ¶ 57).

35

Malloy, who advised that after reviewing all films, CT's and MRI's, he felt that there were two options for the plaintiff. The first was a relatively safe and simple procedure to remove the tip of the jaw bone to allow freedom of jaw movement since it was impinging into the orbit/zygoma. This option would restore function, but not appearance. The second was to do a comprehensive reconstruction which would include re-breaking of the zygoma and orbit bones. The oral surgeon indicated that he did not do this type of procedure which would have to be performed by a plastic/osteoclastic surgeon.

On January 18, 2007, defendant Vermeire saw the plaintiff at the chronic care clinic. He noted that the plaintiff had requested the second option, (i.e., reconstructive surgery), and that an administrative request had been submitted for approval[30].

On February 14, 2007, the request for reconstructive surgery was denied by the Office of Medical Designations, and a more conservative treatment was directed to be pursued locally.

On May 3, 2007, the plaintiff was examined by the Clinical Director at USP-Allenwood. The plaintiff complained of pain and was prescribed Motrin.

On July 6, 2007, defendant Vermeire left the BOP for private practice.

On August 6, 2007, the plaintiff was again seen by defendant Malloy. It was noted that the plaintiff was not motivated to do anything but to have the

---

[30]The plaintiff does not deny this statement, but clarifies that he would have accepted any treatment to relieve his discomfort. (Doc. No. 85, ¶67 and Ex. 14).

oral surgeon fix his condition to the way it was prior to the assault[31]. As a result, the oral surgeon determined that the plaintiff would not benefit from the removal of the tip of the jawbone, since he would regain function but not appearance.  The oral surgeon repeated his recommendation that the plaintiff see an oculoplastics specialist for reconstruction.

On August 21, 2007, the plaintiff was examined by the Clinical Director at USP-Allenwood and continued to complain about his medical treatment.

On November 19, 2007, the plaintiff was seen at Geisinger Medical Center for evaluation of his decreased movement and grinding noise due to his facial fractures. Upon examination of his jaw, it was noted that when the plaintiff's jaw was stretched open to 25 millimeters there was a severe popping sound and partial dislocation of the right tip of the jaw. The plaintiff's jaw was noted to be able to be opened to approximately 30 millimeters and, upon stretching, his mouth was able to be opened to 42 millimeters. When going through range of motion of the jaw, the plaintiff was noted to have good left and right lateral motion with no impingement of the left caracoid process. Fair protrusive movement of the lower jaw was noted. (Doc. No. 64, Ex. A, Attachment 1, pp. 51-53). The surgeon explained the available options for the plaintiff, but the plaintiff insisted that he was to receive reconstructive surgery, and indicated that he would join the surgeon in his lawsuit. At this time, the appointment was terminated.

---

[31]See n.29.

On April 23, 2008, the plaintiff was released from USP-Allenwood to a Residential Release Center.

Defendant Vermeire declares that his review of the plaintiff's medical files reveals that the plaintiff's medical care at USP-Allenwood was consistent with community standards[32].

According to the Government defendants' materials, defendant DeWald is the Assistant Health Services Administrator at USP-Allenwood. As such, she is responsible for providing administrative oversight of the Health Services Department. Defendant DeWald is not a doctor or medical care provider, nor is she licensed to provide such care. Her duties are limited to administrative functions and do not include providing medical care, although she occasionally assists in drawing blood samples, since she is a certified medical technologist. It is the Health Services Department medical staff who are charged with providing medical care to inmates.

Defendant DeWald was away from USP-Allenwood for most of the week during which the plaintiff was assaulted. The plaintiff's medical records reveals that defendant DeWald responded to no fewer than eighteen informal requests to staff submitted by the plaintiff. (Doc. No. 64, Ex. B, Attachment 1).

On September 24, 2007, defendant DeWald prepared a summary of the plaintiff's medical care for the warden after the plaintiff filed an administrative

---

[32]The plaintiff does not deny this statement, but indicates that defendant Vermeire's review is "meaningless." (Doc. No. 85, ¶89).

tort claim[33]. (Doc. No. 64, ¶8). Defendant DeWald's summary was based upon a review of the plaintiff's medical records, including her responses to the plaintiff, and discussions with medical staff. Defendant DeWald also prepared several responses for the warden's signature after the plaintiff filed administrative remedy requests. (Doc. No. 64, Ex. B, Attachment 2). In doing so, defendant DeWald investigated the issues raised by the plaintiff, reviewed the medical records and discussed issues with medical staff. In each instance, defendant DeWald relied on the medical judgment of those staff members who provided the plaintiff with medical care.

In light of the foregoing facts, the Government defendants initially argue that they are entitled to summary judgment with respect to the Bivens claims against defendants Vermeire and DeWald as the plaintiff has failed to establish any deliberate indifference to his medical needs on their part.

The standard for an Eighth Amendment medical claim has been set forth above.  With respect to defendant Vermeire, the record establishes that from August 20, 2006, through July 6, 2007, when he left the BOP for private practice, his treatment of the plaintiff did not rise to the level of deliberate indifference.  Specifically, the record establishes that, after the assault upon him, the plaintiff was provided preliminary treatment and later transported to the Williamsport Hospital emergency room. The plaintiff was followed up with

---

[33]The plaintiff does not deny this statement, but indicates that he never saw it.  (Doc. No. 85, ¶97).

numerous examinations.  Further, he was given prescription medication, and received x-rays, CT scans and MRI's. The plaintiff was sent for a consultation with an outside ENT surgeon, after which he underwent surgery in an attempt to repair his injuries. He received post-surgical care, as well as reviews of his records by an outside radiologist and the ENT surgeon. He later received a consultation with an oral surgeon who recommended additional surgery. While the plaintiff opted for a more extensive reconstructive surgery and a request for same was submitted by defendant Vermeire, that request was denied by the BOP's Office of Medical Designations in favor of a more conservative treatment.

Thus, while the plaintiff may not have received the treatment he desired at USP-Allenwood, the record demonstrates that defendant Vermeire was not deliberately indifferent to his medical needs. Therefore, the Government defendants' motion for summary judgment should be granted with respect to the Eighth Amendment medical claim against defendant Vermeire.

Moreover, with respect to defendant DeWald, there are limitations on bringing a civil rights claim on the basis of improper medical treatment against non-medical prison personnel, who are generally not liable for medical mis- or non-treatment once a prisoner is under the care of medical personnel. Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)(non-medical personnel are "justified in believing that the prisoner is in capable hands" because they are not responsible for medical treatment)(citing Durmer v. O'Carroll, 991 F.2d 64

40

(3d Cir. 1993)). Non- medical prison personnel may only be liable if they had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." Id.

In this case, the record establishes that defendant DeWald responded to no fewer than eighteen informal requests to staff submitted by the plaintiff. On September 24, 2007, defendant DeWald prepared a summary of the plaintiff's medical care for the warden after the plaintiff filed an administrative tort claim. This summary was based upon a review of the plaintiff's medical records, including defendant DeWald's responses to the plaintiff, and discussions with medical staff.  She also prepared several responses for the warden's signature after the plaintiff filed administrative remedy requests. In doing so, defendant DeWald investigated the issues raised by the plaintiff, reviewed the medical records and discussed issues with medical staff. In each instance, defendant DeWald relied on the medical judgment of those staff members who provided the plaintiff with medical care. Moreover, there is no evidence in the record that defendant DeWald had a reason to believe that the medical staff was either mistreating or not treating the plaintiff for his injuries. Given the facts of record, there is no indication that defendant DeWald was deliberately indifferent to the plaintiff's serious medical needs. Therefore, the Government defendants' motion for summary judgment should be granted with respect to the Eighth Amendment Bivens claim against defendant DeWald as well.

41

Next, the Government defendants argue that any Bivens claim against the "John Doe" defendants should be dismissed. The plaintiff listed as defendants in his complaint five "John Doe" defendants. Since the filing of his complaint on March 24, 2008, the plaintiff has not identified or attempted to serve the "John Doe" defendants. In addition, there are no specific constitutional claims set forth with respect to the "John Doe" defendants. As such, the Government defendants' motion should be granted on this basis and the plaintiff's complaint be dismissed with respect to the "John Doe" defendants.

The Government defendants further argue that, to the extent that the plaintiff brings his Bivens claim against the defendants in their official capacity, his complaint should be dismissed. The court agrees. A federal court is without jurisdiction to entertain a suit for money damages against the United States or its agencies unless sovereign immunity has expressly been waived. United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Testan, 424 U.S. 392, 399 (1976); United States v., Sherwood, 312 U.S. 584, 586 (1941). The doctrine of sovereign immunity extends to individual officers sued in their official capacity, because an official capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." Forbes v. Reno, 893 F.Supp. 476 (W.D.Pa. 1995)(citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)). The plaintiff has brought this Bivens action pursuant to 28 U.S.C. §1331. However, this statute does not constitute a

42

waiver of sovereign immunity. Forbes v. Reno, 893 F.Supp. 476, 481 (W.D. Pa. 1995) (citing B.K. Instrument, Inc. v. United States, 715 F.2d 713, 724 (2d Cir. 1983); Holloman v. Watt, 708 F.2d 1399, 1401 (9th Cir. 1983)). In fact, there is no sovereign immunity waiver for claims of constitutional violations. See F.D.I.C. v. Meyer, 510 U.S. 471 (1994) (holding that Bivens suit may not be maintained against the United States or its agencies). Therefore, the Government defendants' motion should also be granted on this basis.

Concerning the plaintiff's FTCA claims, the FTCA allows federal prisoners to pursue suits against the United States in an effort to recover for personal injuries sustained during confinement by reason of negligence of government employees. Berman v. United States, 205 F.Supp.2d 362 (M.D.Pa. 2002)(Nealon, J.)(citing United States v. Muniz, 374 U.S. 150 (1963); 28 U.S.C. §1346(b)). The primary purpose of the FTCA is to "remove sovereign immunity of the United States from suits in tort, and with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." Id. (quoting Richards v. United States, 369 U.S. 1, 6 (1962); 28 U.S.C. § 1346(b)). Under the FTCA, "the law of the place where the alleged act or omission occurred is to be applied." Id. (quoting Turner v. Miller, 679 F.Supp. 441, 443 (M.D.Pa. 1987); 28 U.S.C. § 1346 (b)). In the instant action, the alleged incidents took place at USP-Allenwood, White Deer, Pennsylvania. As such, Pennsylvania law applies to this case.

As noted above, under Pennsylvania law, the plaintiff was required to file a certificate of merit with respect to his medical malpractice claims. He did not properly do so. As such, the Government defendants are entitled to summary judgment on the plaintiff's FTCA medical malpractice claim.

To the extent that the plaintiff alleges an FTCA failure to protect claim, the FTCA provides a federal inmate a cause of action for the United States' negligent failure to protect the inmate. United States v. Muniz, 374 U.S. 150 (1963). As indicated above, Pennsylvania law applies to the plaintiff's negligence claims. Under Pennsylvania law, in order to state a cause of action for negligence, the plaintiff must show: (1) a duty is owed to the plaintiff from the United States requiring the United States to protect plaintiff from unreasonable risks; (2) a breach of that duty; (3) a causal connection between the breach and the resulting injury; and (4) actual damage suffered by the plaintiff. See Nw. Mut. Life Ins. Co. v. Babyan, 430 F.3d 121, 139 (3d Cir. 2005).

Unquestionably, the United States owes federal inmates a duty of care to protect them from unreasonable risks. The United States' duty of care is ordinary diligence, which means that the United States must "exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him." Belcher v. U.S., 2007 WL 2155696, *3 (M.D.Pa., 2007)(citing Turner v. Miller, 679 F.Supp. 441, 443 (M.D.Pa.1987)(Nealon, J.)(internal quotations omitted)). The United States,

however, is "not an insurer of the safety of a prisoner." Id. (citing Hossic v. United States, 682 F.Supp. 23, 25 (M.D.Pa.1987)(Rambo, J.)(internal citations omitted)).

Here, the plaintiff alleges that there was an inter-racial assault involving gang members on the prison yard and that an institutional recall was sounded with all inmates being directed to return to their units. The plaintiff alleges that around this time he was taking a shower. He alleges that several gang members came into the shower and attacked an elderly inmate. In an attempt to assist the elderly inmate, the plaintiff alleges that he himself was attacked and injured as discussed above.

Even assuming the plaintiff's allegations as true, there is no indication that USP-Allenwood officials breached their duty of care to the plaintiff. To this extent, the plaintiff admits that, as a result of the incident in the yard, officials attempted to secure the institution and ordered all inmates to return to their units. There is no indication that the plaintiff perceived any danger as he was either in the shower at the time of the order or proceeded to go to the shower immediately thereafter. There is also no indication that officials were aware of any danger to the plaintiff at the time. As such, the Government defendants' motion should be granted with respect to the plaintiff's FTCA negligent failure to protect claim.

Finally, the Government defendants argue that they are entitled to summary judgment with respect to the plaintiff's claims for emotional distress.

For the reasons set discussed above with respect to the co-defendants' motions, the court agrees.


## IV.    CONCLUSION

On the basis of the foregoing, **IT IS RECOMMENDED THAT:**

**(1)**    the Williamsport defendants' motion for summary judgment, **(Doc. No. 32)**, be **GRANTED**, as set forth above;

**(2)**    defendant Malloy's motion to dismiss, **(Doc. No. 35)**, be **GRANTED**, as set forth above; and

**(3)**    the Government defendants' motion to dismiss and for summary judgment, **(Doc. No. 53)**, be **GRANTED**, as set forth above.




s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States Magistrate Judge**


**Date:**  February 12, 2009

O:\shared\REPORTS\2008 Reports\08-0529-01.wpd